UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHESTER WIDOMSKI,

                              Plaintiff,

        -v-


STATE UNIVERSITY OF NEW YORK (SUNY) at
ORANGE a/k/a ORANGE COUNTY COMMUNITY
COLLEGE,

                              Defendant.

---

Case No.  09-CV-7517 (KMK)

OPINION AND ORDER

Appearances:

Michael Howard Sussman, Esq.
Mary Jo Whateley, Esq.
Sussman & Watkins
Goshen, New York
*Counsel for Plaintiff*

Hyun Chin Kim, Esq.
Orange County Attorney
Goshen, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Chester Widomski brings this action against Defendant State University of New

York (SUNY) at Orange, also known as Orange County Community College ("OCCC"),

alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12132 *et seq.*, and the New York Human Rights Law, 15 N.Y. Exec. L. § 296(2)(a).  (Second

Amend. Compl. at Ex. A ("SAC") ¶ 33.)  Plaintiff alleges that Defendant discriminated against

him by preventing his participation in a phlebotomy clinical program based on his hands

shaking, a perceived disability, and brought a disciplinary action against him in retaliation for

complaining about the discrimination.  (*Id.*)  Defendant now moves for summary judgment on all

claims.  For the reasons stated herein, Defendant's motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from the Parties' submissions and are undisputed except as

otherwise indicated.  In 2008, Plaintiff was a student at OCCC concentrating in the Medical

Laboratory Technology Program (the "Lab Tech Program").  (Def.'s Rule 56.1(a) Statement

("Def. 56.1") ¶ 1; Rosamaria Contarino Aff. at Ex. G ("Contarino Aff.") ¶ 3.)  During the 2008

fall semester, Plaintiff enrolled in the Clinical Training I class, a required course for the Lab

Tech Program that included "routine tasks" in hematology, clinical chemistry, urinalysis, and

phlebotomy.  (Def. 56.1 ¶¶ 1-2; Contarino Aff. ¶ 3, ex. B.)  Plaintiff was assigned to Catskill

Regional Medical Center ("CRMC") in Sullivan County, (Pl. Decl. in Opp. to Def.'s Mot. for

Summary Judgment ("Pl. Decl.") ¶ 4; Contarino Aff. ¶ 3), and Rebecca Sander ("Sander"), an

employee of CRMC (and not OCCC), was assigned as his proctor.  (Def. 56.1 ¶ 16; Rebecca

Sander Dep. at Ex. 3 ("Sander Dep.") at 20-22, 117-18.)  Among other course requirements, the

Clinical Training I course required that each student submit weekly clinical summary reports

signed by his or her proctor and accompanied by a narrative.  (Def. 56.1 ¶ 3; Pl.'s Rule 56.1(a)

Statement ("Pl. 56.1") ¶ 5; Pl.'s Counter Rule 56.1(a) Statement ("Pl.'s Counter 56.1") ¶ 1;

Contarino Aff. ¶ 3, ex. B.)[1]  The weekly clinical summary reports consist of standardized forms

with blanks for date and time; a list of procedures with blank boxes to indicate number observed,

---

[1] The Court notes that the paragraph numbering in Plaintiff's 56.1 Statement is somewhat
disordered.  For ease of reference, the Court cites to the paragraph numbers as they appear in
Plaintiff's submission.

2

number performed, and whether competency was achieved; an area for comments; and signature blanks for the proctor and student.  (Contarino Aff. ¶ 3, ex. B.)

At some point prior to October 7, 2008, Sander conveyed to Plaintiff that he was not permitted to participate in the phlebotomy portion of the clinical, a decision she states was based on her personal observations of Plaintiff's hands shaking, (Def. 56.1 ¶ 16; Rosamaria Contarino Dep. at Ex. D ("Contarino Dep.") at 81; Sander Dep. at 60-61; Pl. Decl. ¶¶ 2, 6), a characterization disputed by Plaintiff, (Pl. 56.1 ¶ 13).

On October 7, 2008, Plaintiff met with Rosamaria Contarino, the Department Chair of the Lab Tech Program, and discussed the fact that the required weekly summary reports and narratives had not been submitted.  (Def. 56.1 ¶ 4; Pl. 56.1 ¶¶ 3-5; Contarino Aff. ¶ 4.) Specifically, as of October 7, 2008, the seventh week of the semester, Plaintiff had not submitted any clinical training summary sheets and had submitted only a small number of narratives.  (Def. 56.1 ¶ 4; Pl. 56.1¶¶ 4-5; Contarino Aff. ¶ 4.)  The Parties dispute whether Plaintiff or Sander was at fault for the failure to provide the reports.[2]  During the meeting, Contarino and Plaintiff signed a written agreement that Plaintiff would submit the required documentation by no later than October 9, 2008 at 2:00 p.m. to avoid receiving an F in the course.  (Contarino Aff. ¶ 5, ex. C.)

Plaintiff and Contarino also discussed the decision to prohibit Plaintiff from participating

---

[2]  Plaintiff argues that he was "precluded from [providing the weekly clinical training summary sheets] by Sander's continued refusal to sign the sheets," (Pl. 56.1 ¶ 2), and that "Sander adamantly refused to sign the weekly reports, thus, frustrating [P]laintiff's attempts to comply with [Contarino's] dictate that he [submit them] by October 8th, under threat of her failing him with an 'F'," (*id.* ¶ 10).  At her deposition, Sander testified that she would not indicate competency on the sheets until the student demonstrated proficiency: "[Contarino's] expectations are when a student successfully is able to perform a task, that the paperwork will be submitted.  That's the expectations.  I am not going to just write yeses and numbers when somebody is not doing the work . . . .  Again, I would not fill out papers saying that someone is competent when they're not."  (Sander Dep. at 55-56.)

in the phlebotomy portion of the clinical due to his shaking hands.  (Pl. Decl. ¶ 7;  SAC ¶ 13;

Chester Widomski Dep. at Ex. B ("Widomski Dep.") at 41, 45; Contarino Dep. at 81-83.)

Contarino conveyed to Plaintiff that as a result of not participating in the phlebotomy clinical

portion, he would be permitted to graduate from the Lab Tech Program, but he would not be

permitted to receive a medical technician license.  (Pl. Decl. ¶ 2; Widomski Dep. at 41, 45;

Contarino Dep. at 81-83.)

    The following day, October 8, 2008, Contarino received faxed clinical training and

narratives from Plaintiff, including a urinalysis summary report dated October 1, 2008 and a

hematology summary report dated October 8, 2008.  (Def. 56.1 ¶¶ 11-12; Pl. 56.1 ¶¶ 8-9;

Contarino Aff. ¶ 6, exs. D, E.)

    Two key events occurred on October 27, 2008.  First, Contarino again notified Plaintiff

that he had not submitted the proper clinical documentation.  (Def. 56.1 ¶¶ 13-14; Pl. 56.1 ¶¶ 10-

11; Contarino Aff. ¶ 7.)  Second, Plaintiff's counsel drafted a letter to Contarino requesting that

Plaintiff be permitted to complete the entire Lab Tech Program, including the phlebotomy

clinical.  (Def. 56.1 ¶ 15; Ltr. from Michael Sussman at Ex. 1.)   It is not clear in which order

these events occurred.

    On November 4, 2008, Contarino received faxed clinical training summary sheets,

specifically a urinalysis summary report and a hematology summary report, both dated October

29, 2008.  (Def. 56.1 ¶¶ 17-18; Pl. 56.1 ¶¶ 14-15; Contarino Aff. ¶ 8, exs. D, E.)  Upon receiving

the reports, Cantarino observed that they appeared to be identical to the October 1 and October 8,

2008 reports with the exception of the new dates and the addition of the letter "Y" in the

competency column of the urinalysis report and the word "Yes" in the competency column of

the hematology report.  (Def. 56.1 ¶¶ 20-21; Contarino Aff. ¶ 8, exs. D, E .)  Sander testified that

4

she signed the urinalysis and hematology reports, dated October 1, 2008 and October 8, 2008 respectively, but that she did not sign the reports dated October 29, 2008, nor did she write the "Y" and "Yes" that appear in the competency columns of those reports.  (Def. 56.1 ¶¶ 21-22; Pl. 56.1 ¶¶ 18-19; Sander Dep. at 123.)

The next day, November 5, 2008, after observing the suspicious similarities in the forms, Contarino forwarded the matter to Paul Broadie, Vice President of Student Services, for disciplinary action.  (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 21; Contarino Aff. ¶¶ 8-9, 11; Paul Broadie Aff. at Ex. H ("Broadie Aff.") ¶ 2.)  A few days later, on November 8, 2008, Broadie met with Plaintiff and discussed the alleged violation of the Student Code of Conduct; Plaintiff also conveyed his version of events to Broadie.  (Def. 56.1 ¶¶ 25-28; Pl. 56.1 ¶¶ 21-26; Contarino Aff. ¶ 11; Broadie Aff. ¶ 3.)  At the time of this meeting, Broadie was unaware of the October 27, 2008 letter from Plaintiff's counsel to Contarino, except to the extent that Plaintiff's wife suggested that she thought the purpose of the meeting was to address a letter from Plaintiff's attorney.  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 27; Paul Broadie Dep. at Ex. E ("Broadie Dep.") at 55-57; Widomski Dep. at 69.)

On November 11, 2008, Broadie offered Plaintiff an informal sanction to resolve the matter: Plaintiff would receive an F and be required to withdraw from the Lab Tech Program.  (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 26; Broadie Aff. ¶ 4.)  Broadie also indicated that Plaintiff was not required to accept the informal sanction and instead could elect a formal hearing.  (Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31; Broadie Aff. ¶ 4.)  Plaintiff declined the informal sanction and requested the formal hearing.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32; Broadie Aff. ¶ 4.)

On December 9, 2008, a Board of Inquiry, composed of three faculty members and four members of the student body with no connection to Plaintiff, met to consider the matter.  (Def.

56.1 ¶¶ 32-33; Pl. 56.1 ¶¶ 32-33; Widomski Dep. at 71; Broadie Aff. ¶ 6.)  Plaintiff, Plaintiff's

counsel, and Contarino attended the hearing; Broadie was not involved in the proceeding, and

Sander did not attend.  (Def. 56.1 ¶¶ 34-35; Pl. 56.1 ¶ 34-35; Pl. Counter 56.1 ¶ 17; Def. Reply

Rule 56.1(a) Statement ¶ 17; Widomski Dep. at 71-72; Sander Dep. at 7-8.)  The Parties dispute

whether Plaintiff and his attorney were permitted meaningful participation in the meeting, but

there is no dispute that Plaintiff did provide statements to the Board.  (Pl. 56.1 ¶ 34; Pl. Counter

56.1 ¶ 18; SAC ¶ 25; Widomski Dep. at 72-73; Further Dep. of Chester Widomski at Ex. C at

19-20.)

On December 12, 2008, the Board of Inquiry found Plaintiff guilty of violating the

Student Code of Conduct and recommended that he be expelled from the Lab Tech Program, be

prohibited from enrolling in any other Allied Health program, and be suspended from OCCC

until fall 2009.  (Def. 56.1 ¶¶ 35-36; Pl. 56.1 ¶¶ 35-36; Broadie Aff. ¶ 8.)  Broadie adopted this

recommendation.  (Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37; Broadie Aff. ¶ 8; Broadie Dep. at 80-81.)

Plaintiff appealed the decision to Dr. William Richards, President of OCCC, and after examining

documentation and meeting with Plaintiff, Plaintiff's wife, Broadie, Contarino, and Sander (via

speaker phone), Richards upheld the decision on January 14, 2009.  (Def. 56.1 ¶¶ 38-41; Pl. 56.1

¶¶ 38-41;  Broadie Aff. ¶ 10; Ltr. from William Richards at Ex. 4 at 79-80.)

B.  Procedural History

On August 27, 2009 Plaintiff filed suit against OCCC in this Court.  (Dkt. No. 1.)

Following a pre-motion conference, the Court granted Plaintiff's request to file an amended

complaint, which was submitted on January 7, 2010.  (Dkt. No. 8.)  After additional

correspondence, Plaintiff filed a Second Amended Complaint, the operative complaint in the case,

on November 29, 2010.  (Dkt. No. 10.)  Following discovery, Defendant filed the instant motion

for summary judgment on March 16, 2012, (Dkt. No. 22), Plaintiff responded on April 19, 2012, (Dkt. No. 33), and Defendant submitted its Reply on May 7, 2012, (Dkt. No. 31).  The Court held oral argument on February 8, 2013.

## II. Discussion

### A.  Standard of Review

Summary judgment may be granted where the movant shows that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted);

*see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  A fact is

material when "it might affect the outcome of the suit under governing law." *McCarthy v. Dun &*

*Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At

summary judgment, a court is not charged with weighing the evidence and determining its truth,

but with determining whether there is a genuine issue for trial.  *See Westinghouse Elec. Corp. v.*

*N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be to

"isolate and dispose of factually unsupported claims."  *Celotex*, 477 U.S. at 323-24.

　　　In the Title VII context, courts are to be "particularly cautious" about granting summary

judgment to employers in cases where the discriminatory intent of the employer is contested.

*Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Schiano v. Quality Payroll*

*Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) ("[A]n extra measure of caution is merited in . . . summary

judgment in a discrimination action because direct evidence of discriminatory intent is rare and

such intent often must be inferred from circumstantial evidence found in affidavits and

depositions." (internal quotation marks omitted)).  Nevertheless, "[i]t is . . . beyond cavil that

summary judgment may be appropriate even in the fact-intensive context of discrimination

cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Thus, while

district courts must pay careful attention to affidavits and depositions which may reveal

circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d

1219, 1224 (2d Cir. 1994), courts are not to "'treat discrimination differently from other ultimate

questions of fact,'" *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 148 (2000)).

B.  Analysis

    1.   Title II Claim

Plaintiff brings his discrimination claim pursuant to Title II of the ADA, which provides

in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Plaintiff's discrimination claim is based entirely on a "perceived disability," the shaking of

Plaintiff's hands; indeed, Plaintiff denies that the hand shaking was ever an actual disability.

(SAC ¶¶ 2, 33.)  Defendant argues that Plaintiff's claim fails for two reasons:  (1) Title II does not

protect perceived disabilities, and (2) even if a "perceived disability" is covered by Title II,

OCCC never regarded Plaintiff as having a disability.  (Defendant's Mem. of Law. ("Def. Mem.")

at 6-11.)  The Court addresses each argument in turn.

    a.  Whether Title II Protects a Perceived Disability

Defendant first argues that Title II does not protect individuals with "perceived

disabilities," because the definition of disability is more narrow for Title II than for other parts of

the ADA.  (Def. Mem. at 6-7.)  The Court begins with the statutory scheme and the plain

language found therein: The ADA is codified at 42 U.S.C. chapter 126, which includes several

sections followed by sub-chapters containing the provisions known as Title I (employment), Title

II (public services), and Title III (public accommodations and services operated by private

entities).  The second section, 42 U.S.C. § 12102(2), defines disability, "as used in this chapter,"

with a three-prong test: "(A) a physical or mental impairment that substantially limits one or more

major life activities of such individual; (B) a record of such an impairment; *or* (C) *being regarded*

*as having such an impairment.*"  42 U.S.C. § 12102(2) (1990) (emphasis added).[3]  As clearly stated in the third prong, part (C), being regarded as having a disability, i.e. having a perceived disability, is included in the definition.  Moreover, nothing in the statutory scheme suggests that the definition of disability differs between the Titles—on the contrary, the definitions section includes an explicit statement that the listed terms are defined "as used in this chapter."  42 U.S.C. § 12102.

Consistent with this statutory language, the Supreme Court has suggested that the three-prong definition of disability in § 12102(2) applies to the entire ADA, not just particular Titles. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 201 (2002) ("[T]he Act's definition of 'disability' applies not only to Title I of the Act . . . ."), *overturned by legislative action on other grounds*, U.S. Pub. L. 110-325 (effective Jan. 1, 2009); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 n.2 (1999) (quoting the entire definition found in § 12102(2) in a Title II case);  A majority of lower courts also have cited the full three-prong statutory definition in Title II cases.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 274 n.7 (2d Cir. 2003) ("[T]he definition of 'disability' applies to all of the ADA." (internal quotation marks omitted)); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (analyzing the § 12102(2) definition in considering a Title II ADA claim); *Mascetti v. Zozulin*, No. 09-CV-963, 2010 WL 1644572, at *4 (D. Conn. Apr. 20, 2010) (same); *Giraldi v. Bd. of Parole, State of New York*, No. 04-CV-877, 2009 WL 3191530, at *11 (N.D.N.Y. Sept. 30, 2009) (same).

---

[3]  Among other changes, the 2008 ADA Amendments Act ("ADAAA") modified the definition of disability.  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  However, the revisions are not relevant to the question of whether the § 12102 definition applies to Title II, and, as explained later, the Amendments are not retroactive to conduct occurring before January 1, 2009, *see infra* Part II (B)(1)(b).  Therefore, for consistency, the Court cites the statutory language as it existed prior to the ADAAA unless otherwise noted.

Notwithstanding this authority, Defendant relies on two cases from the Northern District of New York for the proposition that "disability" in Title II only refers to the first two prongs of the § 12102(2) definition and does not include the third "regarded as" prong.  (Def. Mem. at 7.) Defendant's cited cases appear to have emerged from a single footnote in *Farid v. Bouey*, 554 F. Supp. 2d 301 (N.D.N.Y. 2008):  "[The ADA] definition section appears to apply only to disability discrimination in the employment setting under Title I of the ADA, and discrimination based upon a perceived disability is not similarly actionable under Title II . . . ."  *Farid*, 554 F. Supp. 2d at 327 n.19; *accord Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 441 (N.D.N.Y. 2009) (citing *Farid*, 554 F. Supp. 2d at 326-27).[4]  In reaching this conclusion, the *Farid* court noted that the Rehabilitation Act "offers essentially the same protections to those with disabilities as does Title II," *Farid*, 445 F.Supp. 2d at 326, and then cited the slightly different definition of disability found in the Rehabilitation Act regulations, 45 C.F.R. § 84.3, *see Farid*, 445 F. Supp. 2d at 327 n.19.

This Court respectfully disagrees.  The Court does not dispute that the Rehabilitation Act and Title II of the ADA have similar purposes, *see Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir. 2001), but the plain language of § 12102 provides that its definitions apply "as used in this chapter," which counsels against replacing the ADA definition of disability with the Rehabilitation Act regulatory definition for the purposes of applying an

---

[4]  The Court has identified a third case within the Second Circuit that adopts, without comment, the narrow definition of disability articulated in *Farid*.  *See Silvagnoli v. Fischer*, No. 07-CV-561, 2010 WL 1063849, at *16 (N.D.N.Y. Mar. 1, 2010) (citing *Farid v. Bouey*, 554 F.Supp.2d 301, 326 (N.D.N.Y.2008)), *adopted by* 2010 WL 1063840 (N.D.N.Y. Mar. 22, 2010); *see also McDonald v. Penn. State Police*, No. 09-CV-00442, 2012 WL 5381403, at *10 (W.D. Pa. Oct. 31, 2012) (referencing these Northern District of New York cases but rejecting the claim at issue on other grounds).

ADA title.  In any event, it appears to this Court that the Rehabilitation Act regulatory definition

includes at least some perceived disabilities.  *See* 45 C.F.R. § 84.3(j) (defining a handicapped

person as "any person who (i) has a physical or mental impairment which substantially limits one

or more major life activities, (ii) has a record of such an impairment, *or (iii) is regarded as having

such an impairment*." (emphasis added)).

Therefore, in light of the weight of controlling authority and the plain language of the

ADA itself, the Court finds that the term disability as used in Title II is defined by § 12102, and

includes an individual "regarded as" having a disability.  *See* 42 U.S.C. § 12102(1)(C).

b.  Whether Defendant Perceived Plaintiff As Having a Disability

Defendant next argues that even if Title II protects perceived disabilities, OCCC did not

perceive or regard Plaintiff as having a disability as defined by the ADA.  (Def. Mem. at 7-11.)

As a threshold matter, the Court must determine the proper legal framework for evaluating

this question.  In 2008, Congress enacted the ADA Amendments Act (the "ADAAA"), which

went into effect on January 1, 2009.  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325,

122 Stat. 3553 (Sept. 25, 2008).  Among other amendments, the ADAAA modified the operative

definition of a perceived disability by adding the following language:  "An individual meets the

requirement of 'being regarded as having such an impairment' if the individual establishes that he

or she has been subjected to an action prohibited under this Act because of an actual or perceived

physical or mental impairment whether or not the impairment limits or is perceived to limit a

major life activity."  *Id*. § 3(3).  The ADAAA also explicitly rejected the holdings in two

Supreme Court cases, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota

Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002), stating that those decisions

"have narrowed the broad scope of protection intended to be afforded by the ADA."  *Id*. § 2.

12

Plaintiff block quotes the new statutory language without addressing the question of retroactivity, (Plaintiff's Mem. of Law ("Pl. Mem.") at 7-8), while Defendant argues that the ADAAA is not applicable, because the conduct at issue occurred before the ADAAA went into effect on January 1, 2009, (Def. Mem. at 7, n.2).

In considering ADA claims based on conduct that occurred prior to 2009, the Second Circuit has applied "the version of the statute in effect during the time period at issue." *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 87 n.2 (2d Cir. 2010); *see also Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 50 (2d Cir. 2012) (relying on *Sutton v. United Airlines, Inc.* because the events at issue occurred prior to the ADAAA superseding it); *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009) (explaining that "Congress did not express its intent for [the ADAAA] to apply retroactively, and so we look to the law in place prior to the amendments"); *Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 941 (D.C. Cir. 2009) (citing the ADAAA's delayed effective date, other evidence of legislative intent, and the presumption against retroactivity to hold that ADAAA does not apply retroactively); *E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009) (holding that ADAAA does not apply retroactively).  Lower courts within the Second Circuit also have adopted this approach.  *See, e.g.*, *Villanti v. Cold Spring Harbor Cent. Sch. Dist.*, 733 F. Supp. 2d 371, 377 (E.D.N.Y. 2010) (collecting cases); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 257 n.5 (S.D.N.Y. 2009) (collecting cases and noting that "all courts, in this Circuit and elsewhere, that have addressed the question of whether the ADAAA applies retroactively to claims filed before its effective date have answered in the negative"); *Schroeder v. Suffolk Cnty. Cmty. Coll.*, No. 07-CV-2060, 2009 WL 1748869, at *6 (E.D.N.Y. June 22, 2009) (referencing "the numerous other circuit and district courts that have held that the ADAA amendments do not apply to conduct prior to the

13

effective date of the statute").  In light of this authority, this Court concludes that the ADAAA should not apply retroactively.  Here, the relevant conduct at issue occurred in the fall of 2008; therefore, the Court applies the interpretation of disability in existence at that time.[5]

Prior to the ADAAA, § 12102(2) defined disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of having such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Subsection (C)'s reference to "such an impairment" refers to "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual." *See Sutton*, 527 U.S. at 489.  "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Id.*  In either scenario, the "impairment, whether real or imagined, . . . is regarded as substantially limiting a major life activity." *Id.* at 490; *see also E.E.O.C. v. J.B. Hunt*

---

[5]  For the first time, at oral argument, counsel for Plaintiff argued that the ADAAA should apply to Plaintiff's discrimination claim, because President Richards denied Plaintiff's appeal of the Board of Inquiry disciplinary decision on January 15, 2009.  But, according to Plaintiff's Second Amended Complaint, Defendant's allegedly discriminatory conduct, namely limiting Plaintiff's participation in the phlebotomy portions of Clinical Training I, occurred while he was enrolled in that course during the 2008 fall semester.  (SAC ¶¶ 12-15.)  In fact, Plaintiff's retaliation theory, that the October 27, 2008 letter from counsel ultimately triggered retaliatory disciplinary sanctions, (*id.* ¶ 30), presumes that the complained-of discrimination occurred *before* any disciplinary proceedings were instituted.  Therefore, President Richards' decision to accept the Board's disciplinary findings is not relevant conduct with respect to Plaintiff's discrimination claim.  And, as noted below, Plaintiff does not even claim that President Richards' decision was an act of retaliation.  Instead, at oral argument, counsel for Plaintiff explained that the only retaliatory act that Plaintiff has identified was the November 2008 decision by Contarino to refer Plaintiff for discipline.  Therefore, all of the allegedly actionable conduct in this case pre-dated January 1, 2009.

*Transp., Inc.*, 321 F.3d 69, 74 (2d Cir. 2003) (explaining that "regarded as" disabled claims require evidence "that [defendant] perceived [plaintiffs] as substantially limited in their ability to perform a major life activity"); *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (explaining that "in order to prevail, the plaintiffs were required to adduce evidence that the [defendant] regarded each [plaintiff] as having an impairment that substantially limited a major life activity"). Thus, the key question is whether there is a genuine issue of material fact as to whether OCCC regarded Plaintiff's shaking hands as substantially limiting a major life activity.

Plaintiff does not specify which major life activities OCCC perceived as substantially limited. From Plaintiff's description that "Sander's perception" of "[P]laintiff's 'shaking hands'" resulted in OCCC "disallow[ing] [him] from completing the [Lab Tech] program," (Pl. Mem. at 8-9), the Court surmises that Plaintiff's theory is that OCCC regarded Plaintiff's shaking hands as substantially limiting his major life activity of working.

As it appeared in 2008, the Code of Federal Regulations directed that "[w]ith respect to the major life activity of working," "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i) (2008); *see also Sutton*, 527 U.S. at 491 ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."); *Hammond v. Keyspan Energy*, 349 F. App'x 629, 631 (2d Cir. 2009) ("When the major life activity in question is working, the plaintiff must be perceived as unable to perform a 'broad class of jobs.'"). Therefore, where "the undisputed record evidence demonstrates that [plaintiff]

15

is, at most, regarded as unable to perform only a particular job," summary judgment is appropriate, because "[t]his is insufficient, as a matter of law, to prove that [plaintiff] is regarded as substantially limited in the major life activity of working." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 526 (1999) (affirming grant of summary judgment where "at most, petitioner has shown that he is regarded as unable to perform the job of mechanic only when that job requires driving a commercial motor vehicle" and "has put forward no evidence that he is regarded as unable to perform *any* mechanic job" (emphasis added)); *see also Sutton*, 527 U.S. at 493 (holding that plaintiffs' exclusion from the job of global airline pilot was "a single job," and did not constitute a substantial limitation on working where other jobs, such as regional pilot and pilot instructor, were available); *J.B. Hunt*, 321 F.3d at 75 (holding that driving freight-carrying tractor-trailer trucks over long distances for extended periods of time is a "specific job with specific requirements," and therefore exclusion from that job was not a substantial limitation on working).

Courts have applied this same analysis to cases involving hand shaking or similar issues to find that there was no perceived disability where the hand condition affected only one particular job, rather than a class of jobs. *See E.E.O.C. v. Burlington N. & Santa Fe Ry. Co.*, 406 F. Supp. 2d 1228, 1235 (W.D. Okla. 2005) (finding no perceived disability where plaintiff had weakened left arm and diminished grip strength, because it did not prevent him from a class of jobs, only the specific job of train conductor), *aff'd* 211 F. App'x 682 (10th Cir. 2006); *Cutler v. Hamden Bd. of Educ.*, 150 F. Supp. 2d 356, 358-59 (D. Conn. 2001) (collecting cases holding that carpal tunnel syndrome is not a disability under the ADA where it limits only a specific job); *cf. Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 9-13 (1st Cir. 1999) (upholding verdict of liability resulting from plaintiff's disability of recurrent and permanent bilateral carpal tunnel syndrome where plaintiff

16

presented evidence that the syndrome prevented her from performing manual labor, plaintiff lived in a region largely offering physically demanding jobs, and plaintiff's education and work experience likely would restrict her to those jobs); *Fink v. Printed Circuit Corp.*, 204 F. Supp. 2d 119, 124 (D. Mass. 2002) (denying summary judgment on question of whether plaintiff's condition of Graves disease was a disability where symptoms included "fatigue, memory loss, and lack of muscle control," as well as shaking hands); *Badgley v. Law Sch. Admission Council, Inc.*, No. 99-CV-0103, 2000 WL 33225418, at *1 (N.D. Tex. Aug. 24, 2000) (finding disability where plaintiff had "essential tremors that substantially limit his major life activity of writing" as well as a visual impairment causing double vision that impaired the major life activity of seeing).

In this case, the undisputed record evidence demonstrates, that at most, OCCC perceived Plaintiff as unable to complete the phlebotomy portion of his clinical rotation, thus preventing him from receiving a Medical Laboratory Technician license. Plaintiff does not argue, much less set forth any evidence, that Defendant perceived him as unable to perform a *class* of jobs; on the contrary, the evidence indicates that Defendant regarded Plaintiff as able to perform medical laboratory technician jobs that did not require him to draw blood directly from patients. (Contarino Dep. at 82; Contarino Aff. ¶ 2; SAC ¶ 13.) Therefore, because the undisputed evidence indicates that Defendant regarded Plaintiff as unable to perform only one specific job, that of a licensed phlebotomist, rather than a class of jobs, Plaintiff's claim of discrimination on the basis of a perceived disability fails, and the Court grants summary judgment with respect to the Title II claims.[6]

---

[6] Defendant also argues that Sander's perception of his disability is irrelevant, because she was not an OCCC employee. (Def. Reply at 5.) Because the Court has determined that there is no material dispute as to whether Plaintiff was perceived to be disabled as defined by the ADA, it need not reach the question of whether Sander's employer is relevant.

2.      Retaliation Claim

Defendant next challenges Plaintiff's claim that OCCC retaliated against him due to his complaints about discriminatory treatment.[7]  At the outset, it is important to clarify precisely what Plaintiff identifies as the protected conduct and the retaliation.  At oral argument, counsel for Plaintiff explained that the protected conduct was the letter from Plaintiff's counsel dated October 27, 2008, and the retaliation was Contarino's referral of the disciplinary matter to Broadie.[8]

The ADA provides that: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such

_____

[7]   Neither Party addresses the viability of Plaintiff's retaliation claim if the Court were to find, as it did above, that Defendant did not perceive Plaintiff as having a disability.  In general, "[a] plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks omitted). Defendant does not argue, nor is there any indication in the record, that Plaintiff's belief in Defendant's discrimination was in bad faith or unreasonable; therefore, the Court will consider Plaintiff's retaliation claim independent of its conclusion with respect to Plaintiff's Title II claim.

[8]  The Court notes that Plaintiff's summary judgment papers include new claims that do not appear in the Second Amended Complaint.  First, Plaintiff alleges that Defendant violated the "interference prohibition of the ADA" in addition to the retaliation claim, (Pl. Mem. at 13), a claim that appears nowhere in the Second Amended Complaint.  Second, as part of the retaliation discussion, Plaintiff alludes to "ongoing reasonable accommodations during the academic portions of his program," (Pl. Mem. at 10), and claims that "Contarino[] gain[ed] knowledge that [P]laintiff sought and received a 504 accommodation based on his mental status, i.e., depression and anxiety," (Pl. Mem. at 9 n.3).  But, Plaintiff's Second Amended Complaint affirmatively states that Plaintiff does not suffer from *any* disability, (SAC ¶ 3), and does not refer to any perceived disability other than the shaking hands.  Particularly in light of the fact that Plaintiff declined an additional opportunity to request leave to amend his complaint prior to the instant motion, (Dkt. No. 17), the Court will not consider these additional claims raised for the first time in Plaintiff's motion papers.  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (refusing to consider factual allegations made for the first time in summary judgment papers); *Ifill v. New York State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009) (explaining that a complaint may not be amended by making new claims in motion papers).

individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  The Second Circuit has identified four elements for a prima facie case of retaliation:  "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *Weixel*, 287 F.3d at 148 (internal quotes omitted).

"Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  At the prima facie stage, a plaintiff's burden is "de minimis."  *Id.*  Once a plaintiff establishes the prima facie case, the burden shifts to defendant "to articulate a legitimate, non-retaliatory reason for the challenged employment decision."  *Id.* at 721; *see also Summa v. Hofstra Univ.*, No. 11-CV-1743, 2013 WL 627710, at *7 (2d Cir. Feb. 21, 2013) (describing the burden shifting framework for a summary judgment claim in a Title VII suit).  "If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Treglia*, 313 F.3d at 721(internal quotation marks omitted).[9]

---

[9]  The Court notes that Plaintiff's burden of persuasion is not entirely clear.  In *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), the Supreme Court held that plaintiffs alleging violations of the Age Discrimination in Employment Act ("ADEA") were required to "prove by a preponderance of the evidence . . . that age was the 'but for' cause of the challenged employer decision." *Id.* at 177-78.  The Supreme Court explained that the "motivating factor" language in Title VII permits plaintiffs to advance claims by demonstrating that discrimination formed part of the motive (the so-called "mixed motive" standard), whereas the ADEA's "because" language requires the "but-for" causation standard.  *Id.*

In the Second Circuit, prior to *Gross*, courts applied the "mixed-motive analysis available in the Title VII context" to ADA claims, *see Parker v. Columbia Pictures Indus.*, 204 F.3d 326,

Defendant challenges the second and fourth elements, arguing that Defendant did not know of Plaintiff's discrimination complaint and that there was no causal connection between the complaint and the disciplinary proceedings.[10]  (Def. Mem. at 11-17.)

---

336 (2d Cir. 2000), but given that the ADEA and ADA use similar "because" language in the relevant provisions, it is not clear whether this framework survives *Gross, see Bolmer v. Oliveira*, 594 F.3d 134, 148 (2d Cir. 2010) (noting that "it is questionable whether Title II discrimination claims can proceed on a mixed-motive theory after the Supreme Court's decision in *Gross* . . . where the Court held that the [ADEA] does not authorize a mixed-motive age-discrimination claim," but ultimately not deciding the issue); *Saviano v. Town of Westport*, No. 04-CV-522, 2011 WL 4561184, at *6 (D. Conn. Sept. 30, 2011) (holding that "the but-for causation standard enunciated by the Supreme Court in *Gross* applies in the ADA retaliation context"); *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 343 n.40 (S.D.N.Y. 2010) (applying the mixed motive standard and noting that although recent "Supreme Court case law may indicate that the Court would disapprove of this [mixed-motives] causation standard, and would instead mandate a higher 'but-for' standard . . . as the Supreme Court has not yet discussed causation specifically with respect to the ADA, this court will follow controlling Second Circuit jurisprudence").  Other circuits have issued more definitive statements adopting the 'but-for' *Gross* standard for ADA claims.  *See Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 321 (6th Cir. 2012) ("The ADEA and the ADA bar discrimination 'because of' an employee's age or disability, meaning that they prohibit discrimination that is a 'but-for' cause of the employer's adverse decision.  The same standard applies to both laws." (citing *Gross*, 557 U.S. at 176)); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (applying *Gross* to the ADA by holding that "in the absence of any additional text bringing mixed-motive claims within the reach of the [ADA], the statute's 'because of' language demands proof that a forbidden consideration—here, the employee's perceived disability—was a 'but for' cause of the adverse action"); *see also Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012) (applying *Gross* to the causation analysis resulting from the "because" language of the Rehabilitation Act's retaliation provision).

This Court agrees that the ADEA and ADA "because" language is similar, implying that their respective burdens of persuasion are likely equivalent and thus casting doubt on the continued applicability of the pre-*Gross* mixed motives ADA case law.  However, this Court need not resolve this question, because, as explained below, Plaintiff has failed to present evidence sufficient to meet either burden.

[10] Neither Party addresses the third element of the prima facie case: whether Contarino's referral to Broadie constitutes an adverse decision or course of action.  In *Burlington Northern and Santa Fe Railroad Company v. White*, 548 U.S. 53 (2006), a Title VII case, the Supreme Court explained that a plaintiff pursuing a retaliation claim "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (internal quotation marks omitted); *Kessler v. Westchester Cnty. Dep't*

a. <u>Second Element: Defendant's Knowledge of Protected Activity</u>

With respect to the second element, whether Defendant knew that Plaintiff was involved in a protected activity, Defendant argues that Contarino did not know of the October 27, 2008 letter from Plaintiff's counsel at the time of her November 5, 2008 referral to Broadie.   In order to satisfy the knowledge element, it is not necessary that Plaintiff demonstrate that any particular actor knew of the letter, only that Defendant had general corporate knowledge.  *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) (explaining that the knowledge requirement is met "if the legal entity was on notice" and that "a jury is entitled to disregard [individual agents' claims of unawareness of the protected activity] if they are unreliable").

During her deposition, Contarino testified that she did not remember when she received

---

*of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (emphasizing that the proper analysis considers the objective standard of a "reasonable worker"); *see also Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 90 (2d Cir. 2010) (applying the *Burlington Northern* standard to an ADA retaliation claim).

   In this case, Plaintiff claims that Contarino's referral to Broadie for disciplinary action was a materially adverse action, and drawing all inferences in favor of Plaintiff, this Court agrees that a disciplinary referral could deter protected activity.  *See O'Neal v. State Univ. of New York*, No. 01-CV-7802, 2006 WL 3246935, at *13 (E.D.N.Y. Nov. 8, 2006) (finding that letter informing plaintiff that she was the subject of a disciplinary investigation was a material adverse action); *Doucet v. Univ. of Cincinnati*, No. 05-CV-148, 2006 WL 2044955, at *22 n.19 (S.D. Ohio July 19, 2006) (explaining that "[t]he initiation of a formal disciplinary investigation—even one that does not result in formal discipline" satisfies the "materially adverse" standard), *aff'd* 2007 WL 2445993 (6th Cir. Aug. 28, 2007); *see also Rattigan v. Holder*, 604 F. Supp. 2d 33, 52-53 (D.D.C. 2009) ("[W]hether an action is 'materially adverse' is determined by whether it holds a deterrent prospect of harm, and not by whether the harm comes to pass or whether any effects are felt in the present.").

the letter dated October 27, 2008, (Contarino Dep. at 84), while Plaintiff testified that he personally believed, based on conversations with his attorney, that the October 27, 2008 meeting occurred "the *same* day that [Contarino] received the letter," (Widomski Dep. at 62, 67 (emphasis added).)  Drawing reasonable inferences in favor of Plaintiff, a jury could determine that Contarino herself, or OCCC generally, may have known of the letter dated October 27, 2008 by the time of the alleged retaliation on November 5, 2008.[11]  Therefore, Plaintiff has satisfied his de minimis burden as to the second element.

b.  Fourth Element: Causal Connection

With respect to the fourth element, Defendant argues that there was no causal connection between the letter from Plaintiff's counsel and Contarino's referral.[12]  (Def. Mem. at 12-17.)

---

[11]  Defendant also argues that Broadie had no personal knowledge of the October 27, 2008 letter at the time of his November 11, 2008 meeting with Plaintiff, (Def. Mem. at 12), and the Parties do not dispute this fact, except insofar as Plaintiff's wife suggested during the meeting that she thought its purpose was to address a letter.  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 27; Widomski Dep. at 69; Broadie Dep. at 55-57.)  However, because general corporate knowledge is sufficient to meet this element, Broadie's personal knowledge, or lack thereof, is not dispositive.  Moreover, at oral argument, counsel for Plaintiff clarified that the retaliatory action was Contarino's referral of the matter to Broadie; therefore, the knowledge at issue is Contarino's knowledge at the time of that referral not subsequent meetings.

[12]  As explained previously, at oral argument, counsel for Plaintiff clarified that the retaliatory action at issue is Contarino's referral of the matter to Broadie, not any of the other actions described in the Complaint such as Broadie's referral to the Board of Inquiry, the Board of Inquiry's recommendation to sanction Plaintiff, or the subsequent decisions implementing the Board's recommendation.  To the extent that Plaintiff continues to allege that these other actions constituted retaliation, Plaintiff's causation argument would be viable if he had some evidence that these individuals were aware of Plaintiff's protected activity.
"The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."  *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (emphasis in original). "A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite

Plaintiff relies on the temporal proximity between the October 27, 2008 letter and Contarino's

referral to Broadie on November 5, 2008 as evidence for a causal connection.  (Pl. Mem at 13.)

The Second Circuit has "held that a close temporal relationship between a plaintiff's participation

in protected activity and [defendant's] adverse actions can be sufficient to establish causation."

*Treglia*, 313 F.3d at 720; *see also Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*,

294 F.3d 35, 54 (2d Cir. 2002) (same).  Defendant argues, however, that Plaintiff controlled the

timing of both the drafting of the letter and the faxing of the documents that began the

disciplinary process.  (Def. Reply at 6.)  But, Plaintiff did not control the timing of the decision to

begin the disciplinary process.  To the extent Defendant may be suggesting that Plaintiff

---

knowledge."  *Id.*; *see also Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) ("A
causal connection is sufficiently demonstrated if the agent who decides to impose the adverse
action but is ignorant of the plaintiff's protected activity acts pursuant to *encouragement* by a
superior (who has knowledge) to disfavor the plaintiff." (emphasis in original)).

 In this case, there is *no* evidence, circumstantial or otherwise, that the Board of Inquiry, a
body composed of professors and students with no connection to Plaintiff, knew of the October
27, 2008 letter or acted based on any retaliatory motives.  And with respect to Broadie, the
Parties agree that he had no knowledge of the letter at the time of his November 5, 2008 meeting
with Plaintiff, which was his last involvement prior to the Board of Inquiry decision.  (Def. 56.1
¶ 30; Pl. 56.1 ¶ 27; Widomski Dep. at 69; Broadie Dep. at 55-57.)  Nor is there any evidence that
the alleged retaliator Contarino (or even Sander) played a "meaningful role" in the Board's
decision or that the Board was "overly deferential," such that Defendant might be liable under a
so-called "cat's paw scenario."  *See Herbert v. Nat'l Amusements, Inc.*, No. 08-CV-1945, 2012
WL 201758, at *1 (D. Conn. Jan. 23, 2012) ("Accordingly, the theory of liability that the
'impermissible bias of a single individual can infect the entire group of collective decision
makers . . . at least when the decisionmakers are *overly deferential* to the biased individuals'
recommendations' is one that is well accepted by courts within this Circuit." (emphasis added));
*Saviano v. Town of Westport*, No. 04-CV-522, 2011 WL 4561184, at *7 (D. Conn. Sept. 30,
2011) (describing a cat's paw scenario as one where "a nondecisionmaker with a discriminatory
motive dupes an innocent decisionmaker into taking action against the plaintiff"); *cf. Summa v.
Hofstra Univ.*, No. 11-CV-1743, 2013 WL 627710, at *8 (2d Cir. Feb. 21, 2013) (reversing grant
of summary judgment in light of evidence from which a reasonable jury could conclude that
agents with knowledge of plaintiff's protected activity encouraged decisionmaker to engage in
adverse action); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (in Title VII
context, noting that the bias of a single individual with a "*meaningful role* in the [decision]" can
taint the ultimate decision (emphasis added)).

somehow knew disciplinary proceedings were impending and conspired to send the letter in order

to set up a retaliation claim, this theory does not find support from undisputed evidence.

Therefore, relying on temporal proximity, Plaintiff has met his de minimis burden of establishing

a prima facie case for retaliation.

      As described above, where a plaintiff establishes a prima facie case, the burden shifts

back to the defendant.  *See Treglia*, 313 F.3d at 721.  Here, Defendant meets this burden by

articulating a legitimate, non-discriminatory reason for Contarino's referral, namely her good

faith belief that Plaintiff violated the student code of conduct by falsifying documents.  (Def.

Mem. at 13-17.)  The Court finds that Contarino's claimed good faith belief is supported by the

record.  The October 1 and October 29 urinalysis reports are literally carbon copies of each other

with exactly the same contents except an altered date and the addition of a "Y" indicating

competency on the latter report.  (Contarino Aff. at ex. D.)  The same is true of the October 8 and

October 29 hematology reports with the exception of an added "29" written over the "8" in the

date field as well as a "Yes" indicating competency in the latter report.  (Contarino Aff. at ex. E.)

Additionally, the numbers of procedures observed and performed are identical in the two sets of

reports, belying Plaintiff's explanation that he altered the forms to add progress to the prior

reports.  (Def. Mem. at 16; Widomski Dep. 101-02.)  These suspicious submissions provide

powerful and undisputed evidence for Contarino's good faith belief that Plaintiff doctored the

documents as the reason for her referral of the matter to Broadie.

      As such, it matters not if Plaintiff did not forge these reports, as he insists.  (SAC ¶ 25; Pl.

Mem. at 13.)  Rather, what does matter is that Defendant has offered evidence that Contarino had

a good faith basis for *believing* that Plaintiff had falsified the new reports.[13]  *See Dister v. Continental Grp., Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988) (explaining that because "[e]vidence that [defendant] made a poor business judgment in [its adverse employment decision] generally is insufficient to establish a genuine issue of fact as to the credibility of the [defendant's] reasons . . . [,] the reasons tendered need not be well-advised, but merely truthful"); *Chu v. Tex. S. Univ.*, No. 10-CV-2582, 2012 WL 256419, at *6 (S.D. Tex. Jan. 27, 2012) (granting summary judgment in Title VII case where "[d]efendant articulated a legitimate, non-discriminatory reason for discharge: [p]laintiff allegedly plagiarized a scientific grant proposal"); *Duckett v. Wal-Mart Stores, Inc.*, No. 07-CV-6204, 2009 WL 995614, at *11-12 (W.D.N.Y. Apr. 14, 2009) (noting that "when analyzing a pretext claim the inquiry is whether the employer's stated reason is the actual reason for the challenged action and not whether the employer's stated reason for its decision is ill-advised, mistaken, or unreasonable," and granting summary judgment where defendant claimed that it terminated plaintiff due to her unauthorized use of a discount, a claim plaintiff disputed (citing *Dister*, 859 F.2d at 1116)).

Once Defendant has met its burden, the question becomes whether Plaintiff has established sufficient evidence such that a rational factfinder could conclude that Defendant's "explanation [was] merely pretext for impermissible retaliation."  *See Treglia*, 313 F.3d at 721 (internal quotation marks omitted).  In discussing a plaintiff's burden at this stage, the Supreme Court has noted in the context of Title VII that "a reason cannot be proved to be 'a pretext for

---

[13]  Moreover, after considering these same documents, the Board of Inquiry found that Plaintiff did falsify the reports, thus adding evidence that Contarino's view was held in good faith.  As described above, *supra* note 12, Plaintiff has no viable claim that the Board of Inquiry, whose members included professors and students with no connection to Plaintiff, acted on anything other than their independent determination that the documents were forged.

*discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). Put differently, "[i]t is not enough . . . to *dis*believe the [defendant]; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 519 (emphasis in original). As the Second Circuit very recently explained, "there are two distinct ways for a plaintiff to prevail—either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Summa*, 2013 WL 627710, at *11 (internal quotation marks omitted). Consistent with this axiom, courts within the Second Circuit have regularly held that in order to survive summary judgment, Plaintiff must offer some evidence that the adverse action was motivated, at least in part, by discrimination. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (explaining that "[f]or the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext *for actual discrimination*" (emphasis added)); *Renz v. Grey Adver., Inc.*, 135 F.3d 217, 222 n.3 (2d Cir. 1997) ("[A] discrimination plaintiff may not succeed by proving only that a proffered explanation is false but must prove that discrimination motivated the adverse action . . . ."); *Christoff v. Saturn Bus. Sys.,* No. 10-CV-8505, 2013 WL 394131, at *7 (S.D.N.Y. Feb. 1, 2013) (granting summary judgment and explaining that "the record is devoid of any evidence that would suggest that Defendants' stated reasons for [their] actions are pretext or that Plaintiff was discriminated against in any way on the basis of her gender"); *McPhatter v. New York City*, No. 06-CV-1181, 2009 WL 2412980 at *9 (E.D.N.Y. July 30, 2009) (granting summary judgment because "[d]efendants have offered a nondiscriminatory reason for [plaintiff's suspension], . . . even if a jury were to disbelieve the reason offered by defendant, it could not

rationally find that this reason was a pretext for discriminating against her in violation of the ADA"); *Webster v. Pomperaug Reg'l Sch. Dist. 15*, No. 04-CV-1265, 2007 WL 987539, at *16 (D. Conn. Mar. 30, 2007) ("Even if [defendant's] asserted reason is false, no reasonable jury could conclude, based on the record as a whole, that the plaintiff was terminated in retaliation for requesting accommodations or filing a complaint . . . ."); *cf. Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 (2d Cir. 2010) (holding that "a reasonable juror could find, *not only* that the explanations given by [defendant] for [plaintiff's] termination were pretextual, but also that, together with [defendant's] passing comment . . . it was her age that was the 'but for' cause of [plaintiff's] termination" ).  It is not always necessary that a plaintiff set forth specific evidence showing retaliation: credible evidence that a defendant's explanation is false along with a strong prima facie case may support an inference that the adverse action was motivated by discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000) (explaining that in case where plaintiff made a "substantial showing" that defendant's explanation was false, trier of fact could infer that adverse action was motivated by discrimination); *see also Reg'l Econ. Cmty. Action Program*, 294 F.3d at 54 (vacating district court's grant of summary judgment where "defendants offer no evidentiary support for the non-retaliatory reasons they proffer, and [the court found] no indication in the record" that those reasons were true).

In this case, Plaintiff has not presented any evidence that Defendant's explanation is a false pretext for a retaliatory motive.  At oral argument, counsel for Plaintiff argued that Contarino and Sander conspired to retaliate against Plaintiff, and in response to questioning from the Court, counsel identified as supporting evidence *only* Contarino and Sander's "close"

relationship as shown by their previous discussion of Plaintiff's shaking hands.[14]  While Contarino and Sander admittedly discussed Plaintiff's "shaking hand problem" early in the semester, (Sander Dep. at 58-59), Plaintiff's extrapolation that Contarino and Sander then jointly decided to retaliate against Plaintiff following the October 27, 2008 letter from his counsel finds no support in the record and is just pure speculation.  In fact, there is not even evidence that Sander knew of the October 27, 2008 letter at the time of the referral nor is there any indication that Sander had any role in the referral itself, much less one motivated by a retaliatory animus.[15]

Similarly, Plaintiff's summary judgment papers do not identify any evidence beyond his personal belief: "I believe Mrs. C[o]ntarino's actions in bringing charges against me were in retaliation for having complained about the discriminatory treatment . . . ." (Pl. Decl. ¶ 14.) These conclusory assertions alone are insufficient to allow the jury to infer a retaliatory motive.

---

[14]  Because the Court ultimately finds that Plaintiff has failed to establish his retaliation claim, the Court need not determine whether Defendant would be liable for the actions of Sander, an employee of CRMC, and not of OCCC.  *See Morrissette v. Honeywell Bldg. Solutions SES Corp.*, No. 10-CV-12, 2011 WL 3652428, at *9 (D.R.I. Aug. 17, 2011) ("This Court declines [plaintiff's] invitation to extend 'cat's paw' liability where, as here, the 'subordinate' is an employee of an entity with which the corporate defendant had an arms-length contractual relationship."); *Johnson v. BE & K Const. Co.*, 718 F. Supp. 2d 988, 1003 (S.D. Iowa 2010) (granting summary judgment on other grounds, but "recogniz[ing] that the factual setting of this case presents a somewhat different picture than the traditional cat's paw scenario, namely in the fact that the 'supervisor' who allegedly harbored a discriminatory animus toward Plaintiff . . . was an ADM employee, not [defendant's] employee," noting that "[defendant] can only conceivably be liable for alleged discriminatory conduct by ADM under some type of agency theory of liability, such as the cat's paw theory," and expressing "serious reservations as to whether this factual scenario is a proper expansion of the cat's paw theory"); *see generally Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (explaining that cat's paw theory is based on agency principles).

[15]  At oral argument, Plaintiff briefly suggested that Sander's absence at the Board of Inquiry hearing is evidence that she was having "second thoughts" about her involvement in referring Plaintiff for discipline.  This speculation is wholly unsupported by any record evidence; in fact, the only evidence on Sander's absence is her undisputed statement that she did not attend the Board hearing as a result of work obligations.  (Sander Dep. at 7-8.)

*See Jeffries v. Verizon*, No. 10-CV-2686, 2012 WL 4344197, at *20 (E.D.N.Y. Aug. 31, 2012)

("[Plaintiff] does not provide any evidence to support the contention that his transfer was in any

way related to his hearing impairment or any other activity protected under the ADA. Therefore,

the record contains no evidence from which a reasonable factfinder could conclude that

[defendant's] stated reason for transferring [plaintiff] was a mere pretext for its real intention to

retaliate."), *adopted by* 2012 WL 4344188 (E.D.N.Y. Sept. 21, 2012); *Schupbach v. Shinseki*, No.

09-CV-3513, 2012 WL 3638791, at *13 (E.D.N.Y. Aug. 23, 2012) ("[P]laintiff cannot simply

substitute utter speculation for the competent proof that would be necessary to permit rational

inferences by a jury of discrimination or retaliation."); *McNamara v. Tourneau, Inc.*, 496 F. Supp.

2d 366, 379 (S.D.N.Y. 2007) ("A motion for summary judgment [in the instant ADA case] may

not be defeated by speculation and conclusory assertions.").

      Nor is the evidence that Plaintiff presented in support of his prima facie case sufficient at

this stage to rebut Defendant's explanation. First, Plaintiff's statement that he did not fabricate

the documents, even taken as true, does not actually rebut Contarino's claim of a good faith belief

that Plaintiff did fabricate them. Plaintiff's claim and Contarino's belief are not mutually

exclusive: Plaintiff may not have fabricated the documents, but Contarino could still have a good

faith belief, albeit mistaken, that he did. *See Wontrobski v. S. Huntington Union Free Sch. Dist.*,

No. 02-CV-3755, 2005 WL 1785261, at *5 (E.D.N.Y. June 26, 2005) ("Plaintiff['s] sole

argument for pretext is that she was undeserving of her unsatisfactory evaluations . . . . However,

Plaintiff's subjective disagreement with [her] reviews is not a viable basis for a discrimination

claim." (second alteration in original) (internal quotation marks omitted)); *O'Connor v. Coll. of*

*Saint Rose*, No. 04-CV-0318, 2005 WL 2739106, at *7 (N.D.N.Y. Oct. 24, 2005) (granting

summary judgment based on Defendant's "legitimate, non-retaliatory reason for [plaintiff's]

failing grades—plagiarism" and noting that "Plaintiff has failed to sustain his ultimate burden of demonstrating that Defendant's claim of plagiarism was a pretext for unlawful discrimination," because "Defendant's proffered reason appears to be true," and "Plaintiff has not otherwise proffered sufficient evidence from which a fair-minded trier of fact could reasonably conclude that Defendant failed Plaintiff in retaliation for his filing grievances or claims of discrimination"). Indeed, nothing in the record undermines Contarino's claim of a good faith belief that Plaintiff falsified the documents; on the contrary, as noted above, a comparison of the urinalysis and hematology summary reports provides evidence from which one easily could conclude that the October 29 reports were falsified, as the Board of Inquiry itself determined.  Put simply, Plaintiff's explanation of the markings on the reports is internally inconsistent and belied by the documents themselves, and therefore Plaintiff has failed to refute Contarino's claim of a good faith belief.  *See Shepheard v. New York City Corr. Dep't*, 360 F. App'x 249, 251 (2d Cir. 2010) (affirming grant of summary judgment where plaintiff did not establish that the "proffered reason for [the adverse action]," a disciplinary charge, was false or "a pretext for discrimination"); *Cf. Treglia*, 313 F.3d at 722 (summary judgment denied where statements by defendant showed discrimination and record evidence refuted defendant's explanation); *Saviano*, 2011 WL 4561184, at *7 (finding evidence of pretext where record itself suggested that defendant's explanation was false, and the court found it "abundantly clear . . . that [defendants] disliked plaintiff").

Second, while temporal proximity may be sufficient for a prima facie case, it is insufficient to demonstrate retaliatory intent given the undisputed evidence of Defendant's explanation.  *See Reilly v. Metro-N. Commuter R.R. Co.*, No. 93-CV-7317, 1996 WL 665620, at *14 (S.D.N.Y. Nov. 15, 1996) ("The timing of events alone, even if sufficient to meet plaintiff's

30

prima facie burden, cannot defeat summary judgment in the face of defendant's proffered legitimate reason."); *see also Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 210 n.28 (D. Conn. 2000) (collecting cases).  The record reveals that the inquiry into Plaintiff's failure to comply with the course requirements and the impact of his shaking hands condition began long before the letter from Plaintiff's counsel.  As early as October 7, 2008, twenty days before Plaintiff's counsel's letter, Contarino met with Plaintiff to discuss his missing reports, a discussion apparently sufficiently serious to warrant a signed agreement stating that Plaintiff would receive an F in the course if he did not submit the required documentation.  (Contarino Aff. at ex. C.)  The fact that a follow-up meeting in which Plaintiff agreed to submit additional reports occurred the same day that a letter from Plaintiff's counsel was drafted and that, shortly thereafter, Contarino scrutinized Plaintiff's facially suspect reports does not, by itself, rebut Defendant's explanation.

Therefore, because Plaintiff has not offered sufficient evidence to rebut Defendant's credible explanation for Contarino's referral, the Court finds that Plaintiff has failed to establish that there is enough disputed evidence to substantiate the fourth element of causation, and the Court grants summary judgment for Defendant as to the retaliation claim.

      3.   <u>State Law Claim</u>

Because there are no remaining federal claims in the lawsuit, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim pursuant to the New York Human Rights Law section 296(2)(a).  (SAC ¶ 33.)  *See* 28 U.S.C. § 1367(c); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (explaining that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims" (internal quotation

marks omitted)).[16]

### III. Conclusion

For the reasons stated herein, Defendant's motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 22), and

close this case.

SO ORDERED.

Dated:      White Plains, New York
            March 20, 2013

                                    _____
                                    KENNETH M. KARAS
                                    UNITED STATES DISTRICT JUDGE

---

[16] Plaintiff's state law claim also may be barred on sovereign immunity grounds, because New York has not waived its Eleventh Amendment immunity for NYHRL suits in federal courts. (Def. Mem. at 17-19.) *See Tuckett v. N.Y. State Dep't of Tax. & Fin.*, No. 99-CV-0679, 2000 WL 1028662, at *2 (S.D.N.Y. July 26, 2000) (explaining that New York has not consented to be sued in federal court with respect to NYHRL claims); *see also Smith v. State Univ. of New York*, No. 00-CV1454, 2003 WL 1937208, at *7 (N.D.N.Y. Apr. 23, 2003) ("[T]he district courts in this Circuit have repeatedly held that the New York Human Rights Law does not include a waiver of the State's sovereign immunity to suit in federal court." (internal quotation marks omitted)). The Parties dispute whether OCCC should be considered an arm of the state for Eleventh Amendment purposes. (Def. Mem. at 19; Pl. Mem. at 10-12.) *See, e.g., Kohlhausen v. SUNY Rockland Cmty. Coll.*, No. 10-CV-3168, 2011 WL 1404934, at *7 (S.D.N.Y. Feb. 9, 2011) (examining Rockland Community College's funding structure to determine that "community colleges are ultimately accountable to, and dependent upon, the state" (internal quotation marks omitted)), *amended* 2011 WL 2749560 (S.D.N.Y. July 13, 2011). However, because the Court declines to exercise supplemental jurisdiction, it need not determine the sovereign immunity issue. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (explaining that a "federal court has leeway to choose among threshold grounds for denying audience to a case on the merits" (internal quotation marks omitted)).

Service List: (by ECF)

Michael Howard Sussman
Sussman & Watkins
55 East Main Street
Goshen, NY 10924
(845) 294-3991
Fax: (845) 294-1623
Email: sussman1@frontiernet.net
*Counsel for Plaintiff*

Hyun Chin Kim
Orange County Attorney
255 Main Street, County Government Center
Goshen, NY 10924
(845) 291-3150
Fax: (845) 291-3167
Email: hkim@co.orange.ny.us
*Counsel for Defendant*